IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| BILLY R. DEARMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 14-CV-162-CVE-PJC |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

Claimant, Billy R. Dearman ("Dearman"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Dearman's application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq*. Dearman appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that he was not disabled. This case has been referred to the undersigned. For the reasons discussed below, the undersigned recommends that the Commissioner's decision be **REVERSED AND REMANDED**.

**Claimant's Background**

Dearman was 58 years old at the time of the hearing before the ALJ on December 10, 2012. (R. 46). He had completed tenth grade, and he never obtained a GED. *Id.* He said that he had been in special education classes for reading and spelling. (R. 58). He said that he had never been good at math and could not count change. *Id.* He did not read for pleasure. (R. 58-59). His sister and his girlfriend had helped him with the Social Security paperwork. (R. 59). He had

last worked as a welder at a weld shop. (R. 47-48, 62). He described having a relationship with that employer that was erratic in part due to his mental issues, including paranoia. *Id.* He said that he had been fired or quit several times, and the employer had rehired him, but the last time he had been fired, the employer would not rehire him. *Id.*

Dearman testified that he had difficulty sitting more than 30 minutes or one hour because his back hurt. (R. 48-49). His back and legs hurt if he stood more than an hour-and-a-half or two hours. (R. 49). He thought these problems were due to a car accident five or six years earlier. *Id.* He also experienced leg cramps if he stood or walked too much. *Id.* Dearman testified that he also had broken his right ankle three times, and it would bother him when he walked or stood. (R. 49-50). Dearman thought that he could walk about a block or one-and-a-half blocks before stopping. (R. 50). He said that he spent about three hours a day lying down due to pain. *Id.* He could only do chores around the house for two hours before needing to lie down. (R. 59). He would also lie down sometimes due to nervousness. (R. 59-60). About half of his left thumb had been cut off in 1973, and that affected his grip, but his right hand was okay. (R. 50-51). He said that he dropped items about once a week. (R. 51).

Dearman said that he could not lift any more than a two-pound coffee can full of animal feed. *Id.* He could not lift the feed by himself. *Id.* He thought he spent about 45 minutes each day feeding and watering his girlfriend's animals. (R. 51-52). She had four cows, five goats, and 20 chickens. (R. 52).

Dearman testified that he drove about twice a week to a store that was about four miles away. (R. 52-53). He said that he needed to have a routine, and he liked to go to the same stores and the same places. *Id.* When driving, he would sometimes worry that he had hit something, and he would have to return to the area to make sure that he had not done anything wrong. (R.

53). He testified that this hindered his ability to get anywhere, and he never drove at night. (R. 53-54). He described this worrying about hitting people as a sense of panic. (R. 54).

Dearman testified that he was in counseling, attending sessions with his counselor every two weeks and with a doctor every month. *Id.* He had been seeing them for about a year. (R. 55). When asked what his mental issues were, he first mentioned his paranoia, and then his panic attacks. *Id.* He said he had panic attacks about three times a week for about 30 minutes. *Id.* He said that his physicians had tried a lot of different medications, including medication to help him sleep. (R. 55-56). Before the medication, he had little sleep, but with the medication, he was sleeping about eight hours a night. (R. 56). He experienced side effects with the medications that made him sick or made him have suicidal thoughts. (R. 57). Dearman said he had mood swings every day. (R. 56). He had auditory hallucinations about once a month. (R. 57-58).

Dearman said that he stayed to himself as much as he could because he did not deal well with people and crowds. (R. 58). He said that he hardly ever left his house, and when he did, he went to the same places. (R. 60-61). He worried that he might do bad things if he went out by himself, and he was more comfortable if he was with his girlfriend or somebody. *Id.*

On January 10, 2005, Dearman was seen by F. Jera Burghart, M.D., for a chief complaint of depression. (R. 208-09). On examination, Dr. Burghart noted that Dearman had painful range of movement of the right shoulder. (R. 209). Her diagnoses were bipolar disorder and depression, and she continued Zoloft and added Seroquel. *Id.* On November 21, 2005, Dr. Burghart noted that Dearman was doing better on Seroquel, and she increased the dosage. (R. 206-07). On January 12, 2006, Dr. Burghart diagnosed bursitis and tendinitis of the right shoulder and arm, and hyperglycemia. (R. 204-05). Dearman returned on May 4, 2006 with continued pain of the right shoulder and elbow. (R. 202-03). On July 17, 2007, Dearman

3

complained of increasing anxiety and agitation. (R. 194-95). On November 6, 2007, Dearman complained of neck and left shoulder pain, as well as trouble sleeping. (R. 192-93). Dr. Burghart prescribed prednisone, Flexeril, and Lortab. (R. 193). On January 24, 2008, Dearman saw Dr. Burghart complaining of injury primarily to his left side due to a car accident. (R. 190-91).

On August 18, 2011, Dearman saw Dr. Burghart, and one of his complaints was pain and tenderness of his right ankle. (R. 274-75). Dr. Burghart instructed him to use over-the-counter pain medications. (R. 275). On November 21, 2011, Dearman presented to Dr. Burghart with mood swings and insomnia. (R. 276-77). Dr. Burghart stated that Dearman was anxious, had poor insight, and exhibited poor judgment. (R. 277). She said that he reported mood swings and obsessive thoughts. *Id.* She stated that Dearman probably had a combination of bipolar disorder, obsessive-compulsive disorder, and phobias, and she hoped that the mental health clinic he was attending could give him the appropriate medications. *Id.*

Dearman saw Christopher Blaisdell, D.O., on December 1, 2011 for medication management. (R. 342-43). Dearman complained of paranoia that continually interfered with his ability to keep employment. (R. 342). He complained of racing thoughts and depression. *Id.* Dr. Blaisdell diagnosed Dearman on Axis I[1] with mood disorder not otherwise specified and with obsessive-compulsive behavior. (R. 342). He started Dearman on Abilify as a mood stabilizer. *Id.* On December 29, 2011, Dr. Blaisdell noted that Abilify had made Dearman worse, and he changed his medications to Zyprexa and Paxil. (R. 345-46). On February 13, 2012, Dearman

---

[1] The multiaxial system "facilitates comprehensive and systematic evaluation." *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000) (hereinafter "DSM IV").

4

was again worse, and Dr. Blaisdell changed his medication to Risperdal. (R. 348-49). On February 27, 2012, Dr. Blaisdell stated that Dearman had not tolerated Risperdal, and he started him on Lamictal and Vistaril. (R. 251-52). On March 7, 2012, Dr. Blaisdell stated that Dearman did not tolerate Lamictal, but did tolerate Vistaril. (R. 254-55). He added Prozac. (R. 254). On March 26, 2012, Dr. Blaisdell discontinued the Prozac and started Dearman on Zoloft in addition to the Vistaril. (R. 357-58). On April 23, 2012, Dr. Blaisdell added Geodon to Zoloft and Vistaril. (R. 360-61). On May 7, 2012, the Geodon was discontinued. (R. 363-64). On May 21, 2012, Abilify was added to the Zoloft and Vistaril. (R. 366-67). On June 4, 2012, Dearman reported to Dr. Blaisdell that he did not tolerate the Abilify and that he had discontinued the Vistaril due to fatigue. (R. 369-70). Dr. Blaisdell increased the Zoloft and added Neurontin. (R. 369). On June 18, 2012, Dearman reported that he had not tolerated the Neurontin. (R. 372-73). He was only taking the Zoloft and was "doing well." (R. 372). On July 12, 2012, Dearman continued to be doing better on just Zoloft. (R. 375-76).

Two documents were signed on July 23, 2012 by Dr. Blaisdell and by Maura Pollak, L.P.C. (R. 380-84). The first document was titled "Mental Residual Functional Capacity Assessment" and the second was called "Mental Status Form." *Id.* The assessment form indicated that Dearman had a severe limitation with 10 out of the 20 activities listed. (R. 380-81). Marked limitations were indicated in 8 additional categories, with moderate limitations in the two remaining categories. *Id.* On the Mental Status Form, Dearman was described as being on time for appointments, having good hygiene, but appearing nervous and restless. (R. 382). The form noted that Dearman spoke in half-completed sentences. *Id.* He reported difficulties with all personal relationships. *Id.* His thoughts were frequently distorted, and he showed little insight. *Id.* He sometimes appeared angry during therapy sessions and would obsessively return

to incidents that had triggered his anger. *Id.* Dearman reported a history of responding to stressors with panic or with angry outbursts. *Id.* The form stated that Dearman's initial diagnosis had been obsessive-compulsive disorder and that a diagnosis of bipolar 2 disorder had been added as of the date of the form. (R. 384).

Agency examining consultant Sabera Shabnam, M.D., completed a physical examination of Dearman on September 17, 2011, and Dearman's chief complaint was back pain. (R. 231-36). On examination, Dearman moved about the room easily and had full range of motion of the spine. (R. 232). Straight leg raising was negative, and toe and heel walking was normal. *Id.* He had a stable gait at an appropriate speed. *Id.* Dr. Shabnam's assessments were back pain, depression, and anxiety. *Id.* Agency nonexamining consultant Donald Baldwin, M.D., wrote on October 3, 2011 that Dearman's physical condition appeared to be nonsevere. (R. 256).

Agency examining consultant Minor W. Gordon, Ph.D., saw Dearman for a psychological examination on August 24, 2011. (R. 228-30). Dr. Gordon said that Dearman's mood was one of mild anxiety. (R. 228). Dearman was attentive and alert, and he maintained good eye contact. *Id.* His manner and attitude were appropriate. *Id.* Dr. Gordon estimated that Dearman's intelligence was low average, and he said that Dearman's social-adaptive behavior was such that he might have difficulty passing judgment in a work situation depending on the complexity of the task. (R. 229). Dearman admitted occasionally thinking that people were against him, but his thoughts were coherently organized. *Id.* His immediate, short-term, and long-term memory were all considered adequate. *Id.* In summary, Dr. Gordon said that Dearman did appear to have some problems with obsessive-compulsive personality traits and mild anxiety, but these problems should not "preclude him from gainful employment." *Id.* He said that Dearman was capable of performing routine repetitive tasks and of relating adequately with co-workers and supervisors on

a superficial level for work purposes. *Id.* Dr. Gordon's Axis I diagnosis was mild anxiety, not otherwise specified, and his diagnosis on Axis II was obsessive-compulsive personality traits. *Id.* He assessed Dearman's Global Assessment of Functioning ("GAF")[2] as 70. *Id.*

Agency nonexamining consultant Edith King, Ph.D., completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment dated September 19, 2011. (R. 238-55). In the Psychiatric Review Technique form, for Listing 12.06, Dr. King noted Dearman's obsessive-compulsive personality traits and mild anxiety not otherwise specified. (R. 243). For the "Paragraph B Criteria,"[3] Dr. King indicated that Dearman had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (R. 248). In the "Consultant's Notes" portion of the form, Dr. King

---

[2] The GAF score represents Axis V of the multiaxial assessment system. *See* DSM IV at 32-36. A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id.* at 32. The GAF scale is from 1-100. *Id.* A GAF score between 21-30 indicates "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id.* at 34. A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id.* A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning," and 51-60 reflects moderate symptoms or moderate difficulty in functioning. *Id.* Scores between 61-70 reflect "some mild symptoms" or "some difficulty" in functioning, but "generally functioning pretty well." *Id.* A score between 71 and 80 reflects symptoms that are transient and reactions to stressors with no more than slight impairment in functioning. *Id. See also Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir. 2012).

[3] There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

7

summarized Dr. Gordon's report in some detail and noted Dr. Shabnam's observations that Dearman was cooperative with clear speech and normal thought processes. (R. 250).

In the Mental Residual Functional Capacity Assessment, Dr. King indicated that Dearman was markedly limited in his ability to understand, remember, and carry out detailed instructions and in his ability to interact appropriately with the general public. (R. 252-53). Dearman was not significantly limited in the other areas listed on the form. *Id.* In the narrative section, Dr. King wrote that Dearman could perform simple tasks with routine supervision, he could relate to supervisors and peers on a superficial work basis, he could not relate to the general public, and he could adapt to a work situation. (R. 254).

Agency nonexamining consultant James Levasseur, Ph.D., completed a second Psychiatric Review Technique form and a second Mental Residual Functional Capacity Assessment dated January 19, 2012. (R. 323-36). In the Psychiatric Review Technique form, for Listing 12.04, Dr. Levasseur noted a mood disorder. (R. 326). For Listing 12.06, he noted obsessive-compulsive disorder. (R. 328). For the Paragraph B Criteria, Dr. Levasseur indicated that Dearman had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (R. 333). In the "Consultant's Notes" portion of the form, Dr. Levasseur noted Dearman's mental health treatment by Dr. Burghart and by Dr. Blaisdell. (R. 335). He briefly summarized Dr. Gordon's consultative examination report. *Id.* He discussed third party reports of Dearman's activities of daily living. *Id.*

In the Mental Residual Functional Capacity Assessment, Dr. Levasseur indicated that Dearman was markedly limited in his ability to understand, remember, and carry out detailed instructions. (R. 337). Dr. Levasseur indicated that Dearman was moderately limited in six of

the remaining 18 categories, leaving 12 categories with no significant limitation. (R. 337-38). In the narrative section, Dr. Levasseur wrote that Dearman could understand and follow simple instructions. (R. 339). He wrote that Dearman could "produce concentrated effort needed to complete most tasks most of the time with some occasional disruption of sustained concentration expected." *Id.* He said that Dearman could get along with others most of the time with occasional problems with social interaction expected, and he said that Dearman could adapt to the demands of a work environment of low social demand. *Id.*

## Procedural History

Dearman filed his application for disability insurance benefits on June 13, 2011. (R. 100-01). Dearman asserted onset of disability on July 12, 2007. (R. 100). The application was denied initially and on reconsideration. (R. 76-79, 81-83). An administrative hearing was held before ALJ Lantz McClain on December 10, 2012. (R. 41-71). By decision dated January 9, 2013, the ALJ found that Dearman was not disabled. (R. 12-20). On February 6, 2014, the Appeals Council denied review. (R. 1-4). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. § 404.981.

## Social Security Law and Standard Of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability

9

claim. 20 C.F.R. § 404.1520.[4] *See also Wall v. Astrue*, 561 F.3d 1048, 1052-53 (10th Cir. 2009) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Lax*, 489 F.3d at 1084 (citation and quotation omitted).

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Wall*, 561 F.3d at 1052 (quotations and citations omitted). Although the court will not reweigh the evidence, the court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Id.*

---

[4] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

**Decision of the Administrative Law Judge**

In his decision, the ALJ found that Dearman met insured status requirements through December 31, 2012. (R. 14). At Step One, the ALJ found that Dearman had not engaged in any substantial gainful activity since his amended alleged onset date of May 31, 2010. *Id.* At Step Two, the ALJ found that Dearman had severe impairments of "history of back pain, history of right ankle injuries, mild anxiety, and Obsessive-Compulsive Disorder traits." *Id.* At Step Three, the ALJ found that Dearman's impairments did not meet any Listing. *Id.*

The ALJ found that Dearman had the RFC to perform a range of work at the medium exertional level with only occasional stooping. (R. 15-16). For mental limitations, the ALJ included in the RFC determination that Dearman was limited to simple, repetitive tasks. (R. 16). He said that Dearman could relate to supervisors and coworkers on a superficial level only and that he could not perform work involving the public. *Id.* At Step Four, the ALJ determined that Dearman could not return to past relevant work. (R. 18). At Step Five, the ALJ found that there were a significant number of jobs in the national economy that Dearman could perform, taking into account his age, education, work experience, and RFC. (R. 18-19). Therefore, the ALJ found that Dearman had not been disabled from May 31, 2010 through the date of his decision. (R. 19).

**Review**

Dearman asserts four errors requiring reversal of the ALJ's decision. His first issue is that the ALJ failed to properly evaluate the medical evidence. Plaintiff's Opening Brief, Dkt. #15, p. 2. The second is that the ALJ "ignored and minimized" his impairments. *Id.* The third is that the ALJ failed to find Dearman disabled under the Grids. *Id.* The fourth is that the ALJ's credibility assessment was inadequate. *Id.* The undersigned agrees that the ALJ's evaluation of the two

forms signed by Dr. Blaisdell was legally insufficient. Therefore, the undersigned recommends that the Commissioner's decision be **REVERSED AND REMANDED**.

Regarding opinion evidence, generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a nonexamining consultant is given the least weight. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). A treating physician opinion must be given controlling weight if it is supported by "medically acceptable clinical and laboratory diagnostic techniques," and it is not inconsistent with other substantial evidence in the record. *Mays v. Colvin*, 739 F.3d 569, 574 (10th Cir. 2014). *See also* 20 C.F.R. § 404.1527(c)(2). Even if the opinion of a treating physician is not entitled to controlling weight, it is still entitled to deference and must be weighed using the appropriate factors set out in Section 404.1527. *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004). The ALJ is required to give specific reasons for the weight he assigns to a treating physician opinion, and if he rejects the opinion completely, then he must give specific legitimate reasons for that rejection. *Id.*

In Dearman's case, the ALJ discussed the two forms signed by Dr. Blaisdell, but instead of referencing Dr. Blaisdell's signature, he said that the forms were signed by Maura Pollak, L.P.C. (R. 17). Dr. Blaisdell's signature is difficult to miss, because it is accompanied by a stamp that clearly spells out his name and his Oklahoma licensing information. (R. 381, 384). Dr. Blaisdell is also clearly Dearman's treating psychiatrist, because he saw Dearman approximately 12 times between December 1, 2011 and July 2012, although it appears that some of those contacts may have been by telephone rather than in person. (R. 251-52, 254-55, 342-43, 345-46, 348-49, 357-58, 360-61, 363-64, 366-67, 369-70, 372-73, 375-76).

The ALJ, however, opted not to mention Dr. Blaisdell's name and not to discuss his role as Dearman's treating psychiatrist. Instead, the ALJ said that he gave the two forms signed by Dr.

Blaisdell "only very limited weight" because they were the opinions of Maura Pollak, who was not an acceptable medical source. (R. 17-18). The ALJ did give other reasons for rejecting the opinions contained in the two forms. He said that Ms. Pollak had "repeated [Dearman's] remarks about himself." (R. 17). He said that the opinion that Dearman was markedly limited in his ability to carry out simple instructions was a clear exaggeration, because Dearman had been carrying out at least simple instructions when he was working as a welder. (R. 17-18). The ALJ also said that Dr. Gordon had been of the opinion that Dearman could do some type of routine repetitive task. (R. 18).

The ALJ's explanations for giving the opinions on the two forms signed by Dr. Blaisdell "only very limited weight" are not legally sufficient because the ALJ did not acknowledge these opinions as treating physician opinions. If he genuinely found them not to be Dr. Blaisdell's opinions, then the ALJ was required to explain his factual basis for that finding. *See McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002) (reversing in part because the ALJ had engaged in unsupported speculation by expressing doubt that psychiatrist agreed with report that he had signed). The ALJ's failure in Dearman's case to acknowledge that the two forms were signed by Dearman's treating physician was clear error. The ALJ also clearly erred by failing to evaluate the opinions contained in the two forms in accordance with the requirements for treating physician opinions of the Social Security Administration's own regulations and the Tenth Circuit precedents discussed above.

Based on the foregoing, the undersigned recommends that the decision of the Commissioner denying disability benefits to Claimant be **REVERSED AND REMANDED.**

## Conclusion

The undersigned recommends a finding that the Court takes no position on the merits of Dearman's disability claim, and that "[no] particular result" is ordered on remand. *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993). This case should be remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case. *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003), *citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).

Because the undersigned recommends that this case be reversed due to the ALJ's failure to give an adequate evaluation of the two forms signed by Dr. Blaisdell, it is not necessary to address Dearman's other asserted issues. On remand, the Commissioner should ensure that any new decision sufficiently addresses all issues raised by Dearman.

## Objections

In accordance with 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72(b), a party may file specific written objections to this Report and Recommendation, but must do so by April 23, 2015. If specific written objections are timely filed, the District Judge assigned to this case will make a *de novo* determination in accordance with Rule 72(b). A party waives District Court review and appellate review by failing to file objections that are timely and sufficiently specific (the "firm waiver rule"). *Moore v. Astrue*, 491 Fed. Appx. 921, 923 (10th Cir. 2012) (unpublished), *citing In re Key Energy Res., Inc.*, 230 F.3d 1197, 1200-01 (10th Cir. 2000).

Dated this 9th day of April 2015.

_____
Paul J. Cleary
United States Magistrate Judge